

# IN THE COURT OF CRIMINAL APPEALS
# OF TEXAS

## NO. WR-84,438-01

### Ex parte TERENCE TRAMAINE ANDRUS, Applicant

## ON APPLICATION FOR POST-CONVICTION WRIT OF HABEAS CORPUS
## FROM CAUSE NO. 09-DCR-051034 IN THE 240TH DISTRICT COURT
## FORT BEND COUNTY

KELLER, P.J., delivered the opinion of the Court in which YEARY, KEEL, SLAUGHTER, and MCCLURE, JJ., joined. NEWELL, J., filed a dissenting opinion in which HERVEY, RICHARDSON, and WALKER, JJ., joined.

This case is on remand to us from the Supreme Court of the United States. Regarding one of Applicant's ineffective-assistance claims, the Supreme Court held that Applicant satisfied the deficient-performance prong of *Strickland v. Washington,*[1] but the Court remanded to us for further proceedings because it perceived that we might not have engaged in a prejudice inquiry. In addition, the Supreme Court criticized the concurring opinion in our Court for unduly relying upon *Wiggins*

---

[1] 466 U.S. 668 (1984).

*v. Smith*[2] in its prejudice analysis. We now reiterate—and to the extent our holding was not clear, clarify—that we decided the issue of prejudice when the case was originally before us. In an abundance of caution, we set forth our reasoning on the issue of prejudice and do so based on an independent review of the circumstances to determine whether there is a reasonable probability that the outcome of Applicant's sentencing proceeding would have been different.[3] Although the concurrence did use *Wiggins* as a guide, that opinion nevertheless made some valid points with respect to the mitigating and aggravating evidence, and our prior order outlined some of the evidence consistent with those points. The mitigating evidence is not particularly compelling, and the aggravating evidence is extensive. Based on our independent review, we reaffirm our earlier conclusion that Applicant has failed to show prejudice, and we deny relief.

## A. This Court's Prior Habeas Order

In November 2012, Applicant was convicted of capital murder and sentenced to death. On automatic appeal to this Court, his conviction was affirmed.[4] He later filed a habeas application in which he claimed, among other things, that counsel was constitutionally ineffective for failing to conduct a reasonable investigation and present available mitigating evidence. This Court rejected that claim, concluding that he "fail[ed] to meet his burden under *Strickland v. Washington* to show by a preponderance of the evidence that his counsel's representation fell below an objective standard

---

[2] 539 U.S. 510 (2003).

[3] *See Dewberry v. State*, 4 S.W.3d 735, 757 (Tex. Crim. App. 1999) ("He must show there is a reasonable probability that, but for counsel's errors, the factfinder would have had a reasonable doubt respecting guilt and/or the sentence of death.").

[4] *Andrus v. State*, No. AP-76,936, 2016 Tex. Crim. App. Unpub. LEXIS 1158 (Tex. Crim. App. March 23, 2016) (not designated for publication).

of reasonableness and that there was a reasonable probability that the result of the proceedings would have been different, but for counsel's deficient performance."[5] In a footnote to this holding, we pointed out that the trial court had "misstate[d] the *Strickland* prejudice standard by omitting the standard's 'reasonable probability' language."[6] Although the trial court had recommended granting relief on the claim, we disagreed and declined to adopt any of the trial court's findings of fact and conclusions of law regarding the claim.[7]

In our order, we explained that the current offense involved the attempted carjacking of Avelino Diaz in a Kroger parking lot.[8] Applicant shot and killed Diaz, and while fleeing the scene, shot at two occupants of another car—killing the passenger, Kim-Phuong Vu Bui, and wounding Kim's husband, Steve Bui.[9] Applicant later confessed to the killings.[10]

We further outlined Applicant's history of criminal and violent conduct.[11] Applicant was adjudicated as a juvenile for felony possession of a controlled substance in a drug-free zone and for criminal solicitation to commit aggravated robbery (involving a firearm).[12] He later had to be

---

[5] *Ex parte Andrus*, No. WR-84,438-01, 2019 Tex. Crim. App. Unpub. LEXIS 81, *6 (Tex. Crim. App. February 13, 2019) (not designated for publication) (citation omitted).

[6] *Id.* at *6 n.2.

[7] *Id.* at *6 ("[W]e decline to adopt any of the trial court's findings of fact and conclusions of law, or its recommendation to grant relief regarding Claim 1.").

[8] *Id.* at *1.

[9] *Id.*

[10] *Id.* at *2.

[11] *Id.* at *3-4.

[12] *Id.* at *3.

transferred from Texas Youth Commission (TYC) facilities to adult prison due to his general failure to make progress in TYC's rehabilitation program and his behavior problems, which included aggressive or assaultive behavior towards other youths and staff.[13] A month before the current capital offense, Applicant committed an aggravated robbery, during which he kicked and beat his victim and threatened him with a knife.[14] While awaiting trial in this case in the Harris County and Fort Bend County jails, Applicant also engaged in behavior that was significantly disruptive, violent, and threatening.[15]

We also pointed out that Applicant had numerous gang-related tattoos and that he admitted to having been a member of the "59 Bounty Hunter Bloods" street gang.[16]

We also noted that Applicant testified that he was exposed to drugs as early as age six because his mother sold them, that he rarely had adult supervision at home, and that he started using drugs regularly when he was fifteen.[17] He claimed that he had recently given his life to God and no longer acted out.[18]

### B. Concurring Opinion

A four-judge concurring opinion engaged in a more extensive analysis of Applicant's claim

---

[13] *Id.* at *3-4.

[14] *Id.* at *3.

[15] *Id.* at *4.

[16] *Id.* at *3.

[17] *Id.* at *4.

[18] *Id.*

with respect to the issue of prejudice.[19] Using the Supreme Court's case of *Wiggins v. Smith* as a guide,[20] the concurrence concluded that Applicant failed to show prejudice.[21]

In arriving at this conclusion, the concurrence observed that the additional lay witness testimony that Applicant said should have been presented was not particularly strong: it would have shown merely that "Applicant grew up primarily among street hustlers and drug dealers, that Applicant raised his siblings while his mother was dealing drugs out of the house or on the street, and that Applicant lacked a stable, supportive parental figure."[22] And much of this information "had already been introduced through the testimony of Applicant, his mother, and his father."[23] Also,

---

[19] *Id.* at *7-23 (Richardson, J., concurring).

[20] *Id.* at *18.

[21] *Id.* at *23.

[22] *Id.* at *20.

[23] *Id.* Earlier in its opinion, the concurrence summarized the testimony from Applicant, his mother, and his father, as follows:

> Applicant, his mother, and his father testified regarding Applicant's background and upbringing. To summarize, Applicant was raised by a single mother who sold drugs. Applicant was exposed to drugs as early as six years of age, and started using drugs regularly at age fifteen. Throughout his childhood and early teenage years, Applicant and his siblings were often left unattended for extended periods of time and Applicant "practically raised his little brothers and sisters." Applicant's father was incarcerated for drug-related offenses for most of Applicant's life, although Applicant did live with his father during his freshman year of high school until his father was arrested on new drug charges. Applicant did fairly well in school, but he dropped out of school in tenth grade and started getting in trouble with the law.

*Id.* at *14-15. We note that the evidence that Applicant's mother sold drugs, that applicant was exposed to drugs, and that applicant used drugs came solely from Applicant. *See* 49 TRR 67-68, 78 (mother testified that Applicant did not have access to drugs in her household and that she never saw Applicant use drugs in her home), 50 TRR 16-17 (father testified that he never saw Applicant use drugs but heard about one instance of smoking "weed"). *See also infra* at n.77.

much of the evidence that Applicant said should have been presented was "double-edged." As an example, the concurring opinion cited Applicant's expert witness's report, which included potentially mitigating evidence but also included potentially extremely aggravating evidence such as Applicant's history of abusing and killing animals.[24]

The concurrence noted that Applicant had presented multiple mitigating factors to the jury: testimony about his "background and dysfunctional upbringing," testimony from an expert about "the effects that drugs, alcohol, and an unstable family environment can have on adolescent brain development," and testimony from "a professional counselor that Applicant was beginning to show remorse for the murders."[25] But Applicant had "an extensive record of violent conduct" that would offset this evidence and his proposed additional mitigating evidence.[26] The concurrence also listed much of Applicant's criminal and violent history, similar to what was outlined in this Court's order.[27]

The concurrence noted that this evidence contrasted with the situation in *Wiggins*, in which the defendant had no prior convictions and no violent conduct the State could introduce to offset the mitigating evidence.[28] The concurrence further noted that the mitigating evidence in *Wiggins* that counsel had failed to present was "powerful and not double-edged."[29] Wiggins had suffered "severe privation and abuse in the first six years of his life while in the custody of his alcoholic absentee

---

[24] *Id.* at 20-21.

[25] *Id.* at 21.

[26] *Id.* at 22.

[27] *Id.*

[28] *Id.* at 17, 21.

[29] *Id.* at 17.

mother" as well as "physical torment, sexual molestation and repeated rape during his subsequent years in foster care."[30] And the concurrence noted that Wiggins was "homeless at times and had diminished mental capacities."[31]

### C. The Supreme Court's Decision

The Supreme Court granted certiorari and vacated our decision.[32] In its initial summary, the Court concluded, contrary to our holding, that the record demonstrated that counsel's performance was deficient.[33] The Court further concluded that we "may have failed properly to engage with the follow-on question whether [Applicant] has shown that counsel's deficient performance prejudiced him."[34]

Noting the trial court's characterization of the new evidence proffered by Applicant as a "tidal wave of information . . . with regard to mitigation,"[35] the Supreme Court went on to discuss Applicant's evidence. The Court believed that it "revealed a childhood marked by extreme neglect and privation, a family environment filled with violence and abuse."[36] The Court recounted that Applicant was born into a neighborhood "known for its frequent shootings, gang fights, and drug

---

[30] *Id.* at 19.

[31] *Id.*

[32] *Andrus v. Texas*, 140 S. Ct. 1875 (2020).

[33] *Id.* at 1878.

[34] *Id.*

[35] *Id.* at 1879 (ellipsis in Supreme Court's opinion).

[36] *Id.*

overdoses"[37] and that Applicant was one of five children, whose fathers never stayed as part of the family.[38]  According to the Court, one of the fathers raped Applicant's younger half-sister, other fathers were physically abusive toward Applicant's mother, and all of the fathers were addicted to drugs and had criminal histories.[39]  The Court stated that Applicant's mother engaged in prostitution and sold drugs and that the drug sales were often from home and in view of Applicant and his siblings.[40]  The Court also believed that the mother habitually used drugs, being high more often than not.[41]  According to the Court, the children were often left to fend for themselves, and many times, there was not enough food to eat.[42]  Applicant, the Court believed, assumed responsibility as head of the household, caring for an older brother with special needs, cleaning the house, putting siblings to bed, cooking meals, getting siblings ready for school, and helping siblings with their homework.[43] Applicant was characterized by habeas witnesses as "a protective older brother" and "very caring and very loving," but he was also described as struggling with mental-health issues, and at age ten or eleven, was being diagnosed with affective psychosis.[44]

The Supreme Court said that Applicant allegedly served as a lookout while he and his friends

---

[37]  *Id.*

[38]  *Id.*

[39]  *Id.*

[40]  *Id.*

[41]  *Id.* at 1879-80.

[42]  *Id.* at 1880.

[43]  *Id.*

[44]  *Id.*

robbed a woman of her purse.[45] The Court then recounted that Applicant was sent to TYC, where he was "prescribed high doses of psychotropic drugs carrying serious adverse side effects" and where he "spent extended periods in isolation, often for purported infractions like reporting that he had heard voices telling him to do bad things."[46] The Court also pointed to evidence of multiple instances of self-harm and threats of suicide, including an attempted suicide while awaiting trial in this case.[47] The Supreme Court also noted that the fatal attempted carjacking resulting in Applicant's capital murder convictions occurred when he was age eighteen, shortly after his release from incarceration.[48]

The Supreme Court found counsel to be deficient in three ways: First, counsel conducted almost no mitigation investigation, overlooking a vast amount of mitigating evidence.[49] Second, because of this failure, the evidence that counsel did present backfired by bolstering the State's aggravation case.[50] Finally, counsel did not adequately investigate the State's aggravating evidence, losing critical opportunities to rebut the case on aggravation.[51]

Because the Supreme Court has concluded that counsel's representation was deficient, we need not address in detail the Court's opinion regarding the first prong of *Strickland*. But our

---

[45] *Id.*

[46] *Id.*

[47] *Id.*

[48] *Id.*

[49] *Id.* at 1881.

[50] *Id.*

[51] *Id.* at 1881-82.

discussion of the second prong of *Strickland* requires us to address some of the matters the Court considered in analyzing the first prong. In the next two paragraphs, we detail certain alleged failures by counsel that we address later in our prejudice analysis. These involve some instances in which the Court believed that counsel lost critical opportunities to rebut the State's aggravation case.

First, the Supreme Court said that Applicant's disruptive behavior in TYC "principally comprised verbal threats, but also included instances of [Applicant's] kicking, hitting, and throwing excrement at prison officials when they tried to control him."[52] The Supreme Court concluded that a proper investigation would have shown that Applicant's "behavioral problems there were notably mild, and the harms he sustained severe."[53] Alternatively, the Court concluded that, "with sufficient understanding of the violent environments [Applicant] inhabited his entire life, counsel could have provided a counternarrative of [Applicant's] later episodes in prison."[54]

Second, the Supreme Court indicated that some research by counsel would have revealed that the evidence connecting Applicant to the robbery a month before the instant offense was questionable, with an ex-girlfriend recanting her statement and the police admitting that the belated inclusion of Applicant's photo in a photo array gave rise to "numerous reliability concerns."[55] The Supreme Court indicated that Applicant's photo was conspicuously placed in a central position in the photo array, as the "[o]nly one . . . looking directly up and out."[56] The Supreme Court also

---

[52] *Id.* at 1884.

[53] *Id.*

[54] *Id.*

[55] *Id.* at 1885.

[56] *Id.* at 1885 n.4.

suggested that the ex-girlfriend's original statements inculpating Applicant could have been impeached because the ex-girlfriend said at the habeas hearing that Applicant committing the offense was "impossible."[57]

Turning to the issue of prejudice, the Supreme Court explained that "the reviewing court must consider 'the totality of the available mitigation evidence—both that adduced at trial, and the evidence adduced in the habeas proceeding'"—and 'reweig[h] it against the evidence in aggravation.'"[58] A finding of prejudice requires "a reasonable probability that at least one juror would have struck a different balance" regarding Applicant's "moral culpability."[59]

The Supreme Court found unclear whether we "considered *Strickland* prejudice at all."[60] It opined that our one-sentence denial of Applicant's claim "does not conclusively reveal whether [the Court of Criminal Appeals] determined that Andrus had failed to demonstrate deficient performance under *Strickland*'s first prong, that Andrus had failed to demonstrate prejudice under *Strickland*'s second prong, or that Andrus had failed to satisfy both prongs of *Strickland*."[61] The Supreme Court noted that, unlike the concurrence, we "did not analyze *Strickland* prejudice or engage with the effect the additional mitigating evidence highlighted by Andrus would have had on the jury."[62] And the Supreme Court observed that the concurring opinion did not garner a majority of the judges on the

---

[57] *Id.* at 1885 n.3.

[58] *Id.* at 1886 (quoting *Williams v. Taylor*, 529 U.S. 362, 397-98 (1999)).

[59] *Id.* (quoting *Wiggins*, 539 U. S. at 537-38).

[60] *Id.*

[61] *Id.*

[62] *Id.*

Court of Criminal Appeals.[63]  The Supreme Court concluded, "Given the uncertainty as to whether the Texas Court of Criminal Appeals adequately conducted that weighty and record-intensive analysis in the first instance, we remand for the Court of Criminal Appeals to address *Strickland* prejudice in light of the correct legal principles articulated above."[64]

In a footnote, the Supreme Court criticized the concurrence for relying too heavily upon *Wiggins*.[65]  The Court indicated that the concurrence was wrong to "assume that the prejudice inquiry here turns principally on how the facts of this case compare to the facts in *Wiggins*."[66]  The Court noted that it had "never before equated what was sufficient in *Wiggins* with what is necessary to establish prejudice." The Court then cited a passage in *Wiggins* that characterized the mitigating evidence in its case as "stronger, and the State's evidence in support of the death penalty far weaker, than in *Williams*, where we found prejudice as the result of counsel's failure to investigate and present mitigating evidence."[67]

### D. Analysis

**1. *Our prior order decided the issue of prejudice adversely to Applicant.***

Under *Strickland*, an applicant must satisfy two prongs to show ineffective assistance of counsel: (1) that "counsel's representation fell below an objective standard of reasonableness," and (2) that "there is a reasonable probability that, but for counsel's unprofessional errors, the result of

---

[63]  *Id.*

[64]  *Id.* at 1887.

[65]  *Id.* at 1886 n.6.

[66]  *Id.*

[67]  *Id.* (citing *Williams*, 529 U. S. at 399).

the proceeding would have been different."[68] When we said that Applicant "fails to meet his burden . . . to show . . . that his counsel's representation fell below an objective standard of reasonableness and that there was a reasonable probability that the result of the proceedings would have been different . . .," we were holding that Applicant failed to make the requisite showing on both prongs of *Strickland*.

We did not set forth our reasons for denying habeas relief, but we are not aware of any constitutional requirement to do so.[69]

### 2. Applicant has failed to show prejudice

Nevertheless, in an abundance of caution, we now set forth our reasoning on the issue of prejudice. The Texas statutory mitigation special issue asks:

> Whether, taking into consideration all of the evidence, including the circumstances of the offense, the defendant's character and background, and the personal moral culpability of the defendant, there is a sufficient mitigating circumstance or circumstances to warrant that a sentence of life imprisonment without parole rather than a death sentence be imposed.[70]

The question at this stage is whether there is a reasonable probability that at least one juror would have struck a different balance in answering the mitigation special issue.[71] To answer that question we evaluate the totality of the aggravating and mitigating evidence adduced at trial and in the habeas

---

[68] *Hinton v. Alabama*, 571 U.S. 263, 272 (2014) (internal quotation marks omitted).

[69] *See Ex parte Graves*, 70 S.W.3d 103, 120 n.3 (Tex. Crim. App. 2002) (Price, J., dissenting) (". . . we are not required to write an opinion explaining the reason or reasons we deny relief on applications of habeas corpus . . .").

[70] TEX. CODE CRIM. PROC. art. 37.071, § 2(e)(1).

[71] *See Andrus*, 140 S. Ct. at 1886.

proceedings.[72] Doing so, we find no reasonable probability that at least one juror would have struck a different balance in answering the special issue because the mitigating evidence offered at the habeas stage was relatively weak in that it was not specific to Applicant, was contradicted by other evidence, or overlapped evidence heard by the jury, and because the aggravating evidence was strong.

For example, there is habeas evidence that Applicant lived in a bad neighborhood, that some of his family members suffered physical and sexual abuse, that his mother was a drug addict who sometimes abandoned her children, and that the various fathers of those children were drug-addicted criminals who never stayed with the family. But there was no evidence that Applicant suffered sexual abuse himself, and he consistently denied it.[73] As for physical abuse, Applicant told Dr. Brown that his mother would beat him with a board that left bruises on him and that her boyfriends would beat him with their fists at her behest.[74] But in a 2005 evaluation at TYC he denied a history of physical abuse.[75] Nevertheless, the jury heard some evidence of physical abuse because Applicant testified that he "got whoopings, you know, extensive whoopings" and "got beat," though he did not

---

[72] *Ex parte Gonzales*, 204 S.W.3d 391, 398 (Tex. Crim. App. 2006).

[73] *See* Applicant's trial testimony, 51 TRR 64; Report of Dr. Jerome Brown and Dr. Cassandra Smisson, dated 10-12-12, 10 HRR 174 (State's Exh. 32, p. 4); Josh Ethridge, TYC Psych. Eval., dated 2-28-05, 10 HRR 133 (State's Exh. 25, p. 1) (Applicant "denied history of physical, emotional, or sexual abuse").

[74] He said that his mother used to give him "whoopings," that she paddled him with a board with tape on it, and that the "beatings" left bruises but his school never knew about them because the bruises were covered. 10 HRR 172 (State's Exh. 32, p. 2). He said that "his mother's boyfriends hit him with their fists, when his mother told them to and knocked the wind out of him." 10 HRR 174 (State's Exh. 32, p. 4).

[75] 10 HRR 133 (State's Exh. 25, p. 1).

elaborate further and did not contradict the prosecutor's assertion that he had not suffered physical abuse.[76] Other evidence about family dysfunction was also presented to the jury: Applicant's mother testified at trial that he was very helpful in raising the other children and was in the position to help her the most; his father testified that his own imprisonment made him largely absent from Applicant's childhood, and Applicant testified to his exposure to drugs as early as age six, his mother's drug dealing and periodic abandonment of her children, and his own drug use beginning at age fifteen.[77]

Some habeas evidence suggested that Applicant's mother sometimes left her children without enough food to eat and that Applicant was sometimes hungry, but Applicant told Dr. Brown that his family never went without food or utilities.[78] Applicant testified twice at trial about food but not that he suffered hunger as a child.[79] His first reference to food was a volunteered comment. He testified that his mother "fed us" by selling drugs in response to the question, "Who did she sell drugs to?"[80] He also volunteered the comment, "I practically raised my little brothers and sisters" in response to the question, "During the day, she was working? She was working from time to time?"[81] Given two opportunities to talk about food, and his willingness to volunteer non-responsive comments, it seems

---

[76]  10 TRR 64-65.

[77]  *See* 49 TRR 52-54 (mother's testimony), 50 TRR 13-14 (father's testimony) 51 TRR 48-50 (Applicant's testimony). *See also supra* at nn.17, 23.

[78]  *See* 10 HRR 173 (State's Exh. 32, p. 3).

[79]  *See* 51 TRR 49.

[80]  *Id.* His second reference to food was an affirmation that his family was on food stamps. *Id.*

[81]  *Id.*

that he would have volunteered that he sometimes was hungry as a child if that had been the case.

Habeas evidence also suggested that Applicant had mental health issues, possibly including schizophrenia, but this evidence, too, deserves some skepticism. Whatever his mental health issues were, those issues were not so severe or persistent as to keep him from—according to his own testimony—taking care of his siblings. Furthermore, on the one hand Applicant now claims he had mental health issues, but on the other hand he decries having been treated for them while in TYC. The TYC records offered at the habeas stage documented Applicant's refusal to take psychotropic medications prescribed for him and the discontinuation of those medications and one analyst's conclusion that Applicant's lack of progress in rehabilitation was "behavioral" rather than stemming from a mental health disorder.[82] When he was on medication in TYC he had fewer violent incidents, but not zero, and one analyst theorized that the decrease in violence was a result of Applicant's effort to manipulate the system and to avoid going to adult prison.[83]

Even taking the evidence of Applicant's mental health issues at face value, it was not purely mitigating; it was also aggravating. For example, Dr. Brown's report revealed that Applicant had a disturbing history of animal cruelty.[84] Applicant told Dr. Brown that he had "accidentally" killed a puppy by holding its nose and a dog that drowned in the shower; he killed birds and "blew up frogs"; and he lit firecrackers that he had inserted into cats' anuses.[85] The report also revealed that

---

[82] TYC Analyst note, dated 5-2-06, 10 HRR 150 (State's Exh. 27, p. 2).

[83] Leslie Blizzard, TYC Psych. Assessment., dated 1-13-06, 10 HRR 101 (third page of the last four pages of State's Exh. 16).

[84] *See* 10 HRR 174 (State's Exh. 32, p. 4).

[85] *Id.*

Applicant enjoyed playing with fire and once set fire to his mother's apartment, though she was able to put out the fire.[86]  Juvenile records indicated that Applicant was diagnosed with "conduct disorder" (the juvenile precursor to antisocial personality disorder)[87] and later records documented that he had antisocial personality disorder.[88]

TYC records documented 295 total instances of misconduct, including many assaults against other juveniles and staff, with authorities having to remove him from the general population 77 times.[89]  His assaultive behavior in TYC, as well as his general failure to make progress on rehabilitation, ultimately led to his transfer to adult prison.[90]  Although the Supreme Court described Applicant's infractions at TYC as "notably mild," we conclude that a jury would have been convinced otherwise.  The habeas witness who testified to the mildness of Applicant's behavior[91] nevertheless acknowledged that Applicant had made multiple threats and assaults against other juveniles and staff.[92] The sheer number of times Applicant was removed from the general population indicates he posed a serious, ongoing problem of violence, which was considered so serious that he

[86]  *See id.*

[87]  *See* 10 HRR 135 (State's Exh. 25, p. 3).

[88]  *See* 10 HRR 175 (State's Exh. 32, p. 5).

[89]  *See* document titled *In the Matter of Terence Andrus* TYC # 109556a, 10 HRR 158 (within State's Exh. 28).

[90]  *See* 10 RR 73-76 (within State's Exh. 16) (transfer order); 10 HRR 147 (State's Exh. 26) (transfer document); 150 (State's Exh. 27, p. 2) (analyst note recommending transfer), 10 HRR 157-161 (within State's Exh. 28) (document recommending transfer).

[91]  *See Andrus*, 140 S. Ct. at 1884 n.2 (citing 5 HRR 189).

[92]  *See* 5 HRR 202-204.  There appear to be two sets of overlapping volumes for the writ record: a seven volume set and a forty-one volume set, but the first seven volumes do not line up in the two sets.  We refer to volumes in the forty-one volume set.

was transferred to adult prison. Applicant points to the bad conditions under which juveniles were often placed in TYC while he was there, but even assuming that evidence was admissible, on balance it would have been outweighed by the evidence showing that Applicant was far more dangerous and disruptive than the typical juvenile held in custody of TYC. The number of Applicant's incidents, the obvious violence of many of those incidents, and his later violent incidents during adult incarceration would lead a jury to believe that Applicant's misbehavior during TYC incarceration was a preview of, and consistent with, his behavior as an adult.

The mitigating evidence offered at the habeas stage must also be weighed against the strong and substantial aggravating evidence offered at trial. Applicant's instant capital murder arose from his effort to carjack someone at a supermarket. He first approached Diaz's car after Diaz dropped his wife off at the store. He shot and killed Diaz but abandoned the carjacking when he discovered the car was a stickshift, which he could not drive. He then found another car occupied by a married couple. As the husband tried to drive away, Applicant fired several shots at the fleeing vehicle, one of which killed the wife and another of which wounded the husband. Applicant was later arrested in New Orleans on unrelated charges.[93]

Applicant committed other crimes when he was not in custody. As a juvenile he committed the offense of drug possession in a drug-free zone. The jury also heard about his aggravated robbery of a woman at her parents' house and the commission of a robbery at a dry-cleaning establishment. The Supreme Court discounted these crimes, but we do not, for reasons detailed below.

Two weeks into his probation for the drug offense, he committed the offense for which he

---

[93] *See Andrus*, 2016 Tex. Crim. App. Unpub. LEXIS 1158, *2-6, for a discussion of the events in this paragraph.

was adjudicated as a juvenile for solicitation to commit aggravated robbery. In that offense, he and two others followed a woman to her parents' home, and Applicant held the woman at gunpoint while her purse and gym bag were taken.[94] The Supreme Court discounted this crime, however, saying that Applicant was sentenced to TYC for "allegedly" acting as a "lookout." Although Applicant characterized his participation that way,[95] the victim's testimony was to the contrary. As our opinion on direct appeal explained, the victim identified Applicant at "the arrest scene . . . stating that he was wearing the same clothes as the gunman."[96]

The Supreme Court pointed to the victim's testimony "that she did not and could not identify faces or individuals."[97] However, the victim did testify that she could identify the clothing,[98] and she testified that the gunman wore a red shirt and black shorts.[99] The Supreme Court said that she "described at least two individuals as wearing such clothing,"[100] but the victim denied that assertion. When asked, "Was there any other person there who was wearing the same type of clothing, red shirt, black shorts?" she responded, "No. I don't recall."[101] The record reference supplied by the Supreme Court to support its contrary assertion on this point does not lead to the

---

[94] *See id.* at *8-9 for a discussion of this incident.

[95] *See* Affidavit of J. Sidney Crowley, 10 HRR 15, para. 38 (State's Exh. 1) (summarizing a statement Applicant made during a recording after arrest in New Orleans).

[96] *Andrus*, 2016 Tex. Crim. App. Unpub. LEXIS 1158, at *9.

[97] *Andrus*, 140 S. Ct. at 1880 n.1.

[98] *See* 46 TRR 17.

[99] *See* 46 TRR 15.

[100] *Andrus*, 140 S. Ct. at 1880 n.1.

[101] *See* 46 TRR 15.

victim's testimony but to that of Sergeant Fernando Flores,[102] and Flores did not testify that the victim described two or more assailants wearing a red shirt and black shorts. Instead, Flores testified that he encountered two men at the scene of the arrest:[103] Applicant, who was wearing a red shirt and black shorts and another person who was wearing gray pants and a different shirt over a red t-shirt and black shorts.[104] On cross-examination Flores agreed that the zipper and button of the other person's pants were open, "possibly indicating he was concealing clothing underneath."[105] The trial evidence solidly pointed to Applicant as the gunman.[106]

Just a month or two before the present double murder, Applicant committed a robbery at a dry-cleaning establishment. He chased and beat the owner and threatened him with a knife until he handed over the money Applicant demanded.[107] The victim was too afraid to identify Applicant at trial but testified that the robber was in the courtroom and said he could point in the robber's general direction.[108] He also testified that his pre-trial, photo-array identification was indeed an identification of the robber, and Applicant stipulated that he was the person shown in that photo.[109] The Supreme

---

[102] *See* 46 TRR 21-28.

[103] *See* 46 TRR 24.

[104] *See* 46 TRR 25.

[105] *See* 46 TRR 26.

[106] Even if we were to accept at face value Applicant's claim that he was only a "lookout," which we do not, the episode could not be discounted completely because even serving as a lookout in an aggravated robbery is aggravating.

[107] *See Andrus*, 2016 Tex. Crim. App. Unpub. LEXIS 1158*,* at *9 for a discussion of this incident.

[108] 46 TRR 59-60.

[109] 46 TRR 65-70.

Court, however, questioned the reliability of the identification due in part to police testimony on habeas about the impact of a delay between a crime and an identification.[110]  But the testimony was that such a delay could impact reliability in a given case, not that it did so in the robbery at issue here.[111]  Citing to and quoting from defense counsel's questioning in the habeas record, the Supreme Court also criticized the photo and its placement in the array for depicting Applicant as the only subject in the array who was looking "directly up and out,"[112] But the detective who responded to that question did not entirely agree with that characterization, saying that photo three (a different subject) "may be looking out."[113]  Our inspection of the photo reveals that Applicant's head is tilted back slightly, but he is not looking up, and his posture and gaze are not distinctly different from those of other subjects shown in the array. Consequently, we do not judge the photo array to be unduly suggestive, and we append a copy of it to this opinion as Appendix 1.[114]

Moreover, Applicant had confessed the robbery to his sometime-girlfriend, whom the Supreme Court refers to as an "ex-girlfriend."  The Supreme Court relied on the girlfriend's recantation in a habeas affidavit to question Applicant's guilt in the robbery, but the Supreme Court overlooked the fact that this recantation was later shown to be false.  Before the girlfriend testified at the habeas hearing, habeas defense counsel had moved to withdraw the girlfriend's affidavit

---

[110] *See Andrus*, 140 S. Ct. at 1885 n.4 (citing portions of the habeas record).

[111] *See* 8 HRR 31.

[112] *See Andrus*, 140 S. Ct. at 1885 n.4 (quoting defense counsel's question in the habeas record).

[113] See 8 HRR 35.

[114] *See* 54 TRR, State's Exhibit 183. *See also* Appendix 1.

because he had "learned information that caused us to doubt [her] reliability."[115] Her subsequent testimony at the habeas hearing made clear that habeas counsel's reason to doubt her reliability was that she had perjured herself. In the habeas affidavit, the girlfriend had denied telling the police that Applicant had confessed the offense to her, but during testimony at the habeas hearing she admitted that this denial was not true, that she had given the police the information, that her statements to the police had been captured by an audio recording, and that Applicant had in fact confessed to her that he committed the offense.[116] In fact, the girlfriend was offered immunity by the State to testify about the falsity in the affidavit she had given to habeas defense counsel.[117]

The Supreme Court also relied upon the girlfriend's statement that Applicant's participation in the robbery was "impossible." When questioned further about her statements on the audio recording, the girlfriend said, "I do remember saying that I don't believe he was telling the truth because of that particular day it was impossible."[118] But she did not explain why it would have been impossible or when exactly she made the impossibility claim—when she told the police or when she first recanted in her affidavit—nor did she say whether she still believed the impossibility of it when she testified at the habeas hearing. There was also evidence that the girlfriend had rekindled her relationship with Applicant during the pendency of the habeas proceedings—further undermining the credibility her testimony.[119]

---

[115] *See* 8 HRR 5.

[116] *See* 8 HRR 54, 56, 57, 62, 64-65.

[117] *See* 8 HRR 62.

[118] *See* 8 HRR 57.

[119] *See* 8 HRR 64.

Applicant was also violent in county jail awaiting trial in this case. In April 2009, he assaulted another inmate. When a detention officer intervened, Applicant said, "I don't give a f—," and, "I'm getting the needle anyway." On May 9, 2009, he punched an officer in the face twice. That day, a broken razor blade and a sharpened key ring were found in his cell. On May 11, he jammed open a "panhole" used to pass food to high security inmates, and when an officer came to investigate, Applicant threw urine in the officer's face. He then did a celebratory dance and taunted the officer, "Come on in and get me. There is nothing you can do to me."[120]

On July 5, he attempted to pass pills to another inmate. When the pills were intercepted, he demanded them back and threatened to throw a cup of urine on the officer. Afterwards, he broke the sprinkler head and flooded his cell. He threatened an officer on duty, saying "[I'm] going to get him, you just wait and see," and, "Once you take these handcuffs [off of] me, you are going to see how hard I hit." He told the rest of the staff that he was "going to get all of you." Two hours later, he was taken to a medical clinic because he was complaining of chest pains. When he was returned to his cell he injured the escorting officers by kicking and punching them. He yelled, "I'm going to kill y'all. I told you I'm going to kill y'all." A special response team was called, and it took five officers to subdue him.[121]

On January 4, 2010, he threw an unknown liquid at an officer. When officers sought to handcuff him, he wrapped his arms in a blanket to make them inaccessible. A special response team was called to move him to a more secure cell. On July 10, 2010, Applicant covered the window of his cell so that officers could not see inside. When a special response team went inside, it found that

---

[120] *See id.* at *10-11 for a discussion of events in this paragraph.

[121] *See id.* at *11-12 for a discussion of the events in this paragraph.

Applicant had stopped up the toilet and shower drain and used the shower to flood his cell. The cell wall was covered in feces and two and a half inches of water and feces covered the floor. Applicant was naked, he threw water on the officers, and he resisted attempts at handcuffing by striking at the officers.[122]

On July 27, 2011, Applicant stuck his arms through the panhole of his cell door and refused to remove them. When a special response team was called, Applicant kicked and struck at the team members. He yelled that he was "going to f— somebody up." He was moved to a padded cell, and he covered the new cell window with feces. The next day, Applicant told a guard at meal time, "Don't bring that tray over here, bitch. I'm going to throw it and hit somebody with it." While he was again being moved to a padded cell, Applicant said, "I have three caps. I have nothing to lose. This will be everyday." Once he was in the cell, he said that he "will kill an officer" if given the chance.[123]

The evidence also showed that, while awaiting trial for capital murder, he had the words "murder weapon" tattooed on his hands and a smoking gun tattooed on his forearm.[124]

In saying that the concurring opinion improperly relied on *Wiggins*, the Supreme Court mentioned that the mitigating evidence in *Wiggins* was "stronger, and the State's evidence in support of the death penalty far weaker, than in *Williams*," in which the Supreme Court also granted relief.[125] In *Williams*, mitigating evidence included the fact that Williams voluntarily turned himself in for an

---

[122] *See id.* at *12-13 for a discussion of the events in this paragraph.

[123] *See id.* at *13-14 for a discussion of the events in this paragraph.

[124] *See* 51 TRR 65-68.

[125] *See supra* at n.67.

unsolved crime and expressed immediate remorse.[126] As a child, he had been severely and repeatedly beaten by his father, and his parents had been imprisoned for criminal neglect of their children.[127] Williams was also "borderline mentally retarded."[128] And with one significant exception noted below, Williams seems to have had an otherwise exemplary record during periods of incarceration. Prison records show he received commendations for helping crack a prison drug ring and for returning a missing guard's wallet, and prison officials described Williams as among the inmates "least likely to act in a violent, dangerous or provocative way."[129]

Aside from Williams's conviction of capital murder and robbery in the primary case, the State introduced aggravating evidence in the form of his prior criminal record.[130] As an adult, he committed an armed robbery, grand larceny, two auto thefts, two (possibly three) separate violent assaults on elderly victims, and an arson followed by a robbery.[131] He also had an arson conviction arising from his setting fire in jail awaiting trial in the case before the court.[132] Expert witnesses employed by the State testified that there was a high probability that he would be a future danger to society.[133] The habeas evidence Williams sought to introduce included him being committed three

---

[126] *Williams*, 529 U.S. at 398.

[127] *Id.* at 395.

[128] *Id.* at 396.

[129] *Id.*

[130] *Id.* at 368.

[131] *Id.*

[132] *Id.*

[133] *Id.* at 368-69.

times to the juvenile system: for aiding a larceny, pulling a false fire alarm, and breaking and entering.[134]

We do not rely upon *Williams* as a definitive guide, but it is worth mentioning that, while the aggravating evidence in *Williams* might be roughly comparable to the aggravating evidence in Applicant's case (Williams had a more extensive criminal history, but Applicant had a far more extensive history of violent and disruptive incidents during periods of incarceration), the mitigating evidence in Applicant's case is far weaker. Williams had intellectual impairments and a history of being physically abused. He turned himself in for the primary crime that was otherwise unsolved and expressed immediate remorse. And while there was one substantial dark spot in Williams's record of behavior during incarceration, there was substantial evidence of exemplary behavior, with prison officials saying he was among the least dangerous of inmates. By contrast, Applicant has not shown that he personally suffered physical or sexual abuse nor that he has intellectual impairments.[135] Applicant's expression of remorse was belated, recent, and incomplete at best. And Applicant has not shown himself to be an exemplary prisoner—quite the opposite, his extensive record of violence while being incarcerated strongly suggests he will be a threat to other inmates and staff.

But we do not come to our conclusion because Applicant's case compares unfavorably to *Williams*. Our independent review reveals that Applicant's proposed new mitigating evidence is relatively weak and that some of that sort of evidence—about his family and background—was

---

[134] *Id.* at 396.

[135] IQ testing indicated that Applicant had a full-scale score of 86 (verbal 86, performance 90), a low average score.

presented at trial. Moreover, much of Applicant's proposed new mitigating evidence could be considered aggravating in some respects. And, if his proposed mitigating evidence is admitted, it would likely be accompanied by significant additional aggravating evidence. Finally, the aggravating evidence presented at trial was strong and substantial, and notably, extensive with respect to violence during incarceration. We conclude that Applicant has not shown that the balance of aggravating and mitigating evidence would shift enough to create a reasonable probability that the outcome of Applicant's sentencing hearing would have been different.

We deny relief.

Delivered: May 19, 2021

Publish

**Appendix 1**

Print Photopack

## Harris County Sheriff's Office



1          2          3

4

Print Date: 10/23/2008

5

6

Print Time: 11:08:42 AM

TQT

10/23/08

355 PM

STATE'S
EXHIBIT

183

.25/imagequery/PPPrintView.asp?Bio1ID=true&PPFile=C:\Temp\PP177F.x... 10/23/2008